# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

AMBER D. BROCK,         )
         )
      Plaintiff,       )
         )
      v.         )     Case No.  4:07-CV-00632-NKL
         )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,   )
         )
      Defendant.    )

## ORDER

Plaintiff Amber Brock ("Brock") challenges the Social Security Commissioner's ("Commissioner") denial of her claim for disability, disability insurance benefits, and Supplemental Security Income benefits (collectively, "benefits").   On July 7, 2005, the Administrative Law Judge ("ALJ") found the following:  Brock was entitled to benefits from January 1, 2000 to January 1, 2001; she was not entitled to a continuation of benefits thereafter due to significant medical improvement.  Because the Court concludes that the ALJ's decision is supported by substantial evidence, the Court denies Brock's Petition. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]

## I.    Factual and Procedural History

---

[1]Portions of the parties' briefs are adopted without quotation designated.

### A.     Testimony of Amber D. Brock

At a hearing on May 16, 2005, Brock testified she was 24 years old, stood five feet nine inches, weighed 200 pounds, and had a high school diploma.  She last worked in 2003 in a part-time job at Subway Sandwich Shop.  The job ended because she was having headaches and she was let go because of her medical problems.  Before that, she stated she trained for three months to become a certified nursing aide, but she was let go because her doctor put her on light duty and they kept cutting her hours.  She also worked as a cashier at a gas station for six months, but she had to resign because they kept cutting her hours because of all of her medical appointments.

Brock testified that she began having problems as early as October 1999.  In late 1999, she had surgery for carpal tunnel syndrome on both hands.  In 2000, she said she had symptoms of her menstrual period stopping, severe headaches, and her left eye appeared to droop.  She said these symptoms were related to a pituitary tumor.  She had surgery in 2000 to partially remove it; she then underwent radiation for six weeks, five days a week.

Brock said she had visual problems.  These occurred when she looked up to the sides, causing double vision.  The problems were worse when she was having bad headaches.  She said this impaired her reading and she could not read for more than fifteen or twenty minutes at a time; she would then stop and wait fifteen minutes before trying to read again.  Brock testified that she continued to drive.

Brock described debilitating headaches occurring two to three times a month, severe

enough to stop her from activities. She said she had to lie down. The headaches could last from one to two hours or occur off and on for a few days. She said the headaches started before her tumor was found, and the surgery and radiation helped, but did not completely resolve the problem.

Brock also described ongoing fatigue and tiredness since her surgery. She said she had to sit down and rest more frequently. She stated she could do household chores at her own pace, and would nap most afternoons for one to one and one-half hours. She said she usually slept seven hours a night, but was still fatigued.

Brock stated she suffered from asthma and said she had to take things slower because of her symptoms. She said she could not walk far and had problems with stairs. She thought she could walk up twelve to fifteen steps before stopping and could walk one-half block to one block. After that, she experienced wheezing, weakness, and tightness in her lungs. She thought she could stand for twenty minutes before needing to sit. She could lift fifteen pounds.

Brock also described problems with memory and speech. She said she felt slower and had trouble remembering things, mostly with short-term memory.

Brock described additional medical issues. She said she experienced tremors in her hands every day that interfered with her ability to write for any time and to hold things. She also experienced nausea, diarrhea, abdominal cramping, and hemorrhoids due

to hypothyroidism.  She said her tumor also caused acromegaly.[2]

Brock testified her thyroid was working right after the surgery.  However, she said she began to have problems in 2001 or 2002.  She said her thyroid levels had been difficult to get under control because her pituitary gland did not function properly.

Brock testified about side effects of her numerous medications.  She said the Somovert caused diarrhea and nausea.  She stated that the Synthroid she took for her thyroid problem caused her to be jittery and have shaking hands and insomnia.

Brock testified she had to follow-up regularly with several doctors, including her endocrinologist, oncologist, primary care physician, and neuroopthalmologist.  She also had a magnetic resonance imaging (MRI) scan every six months.

She said she could not do any of her past work on a full-time basis because of headaches and asthma symptoms.  She stated she had tried to keep a job and explained her medical problems to employers and told them about her frequent doctor appointments, but it always ended up being a problem.

B.      Testimony of Medical Expert

Selbert Chernoff, M.D., testified at the hearing as a medical expert ("ME").  He stated that his review of the evidence indicated Brock had a huge pituitary tumor all over the base of her brain that was partially removed in March 2000.  He said the tumor was so

_____

[2]Acromegaly is "a chronic disease characterized by enlargement of the bones of the head, the soft parts of the feet and hands, and sometimes other structures, due to excessive secretion of growth hormone by the pituitary gland."  Dictionary.com Unabridged (v 1.1), retrieved August 01, 2008, from Dictionary.com website: http://dictionary.reference.com/browse/acromegaly.

large it had to be removed through craniotomy rather than through the nose as was the usual course. The ME stated that the parts of the tumor surrounding the carotid arteries had to be left.

After the surgery, Brock had radiation therapy and took medication to further shrink the tumor. The ME noted she experienced numerous problems after that surgery, which was no surprise. These problems included bouts of asthma, elevated blood sugar, vertigo, and multiple other problems. He noted that doctors had been measuring her growth hormone levels and that hers had run just below or just above the upper limit of normal, although they were elevated in 2005. He stated that, judging by the slow resolution of her eye symptoms, the tumor was shrinking. He noted it usually took a few years for benign pituitary tumors to respond to radiation.

The ME concluded that he thought Brock was disabled for a closed period from January 1, 2000, to January 1, 2001, because of surgery and radiation, and the tremendous metabolic effects of her changing hormone levels. He continued that he was not clear what caused any symptoms after that date. He noted she suffered from headaches, dizziness, and visual difficulty with her left eye, but the ptosis of her left eye was improving.

In response to questioning from Brock's counsel, the ME testified that headaches are a credible post-surgical complaint in patients with acromegaly. He noted it was quite possible Brock could experience headaches two to three times a month lasting one hour up to several days. The ME stated that side effects of her medications could cause nausea and diarrhea. He did not believe Brock was restricted by asthma.

The ME concluded that, following January 1, 2001, there was no medical basis for her alleged disabling symptoms. He concluded that from January 1, 2001, Brock was capable of light work.

## C. Testimony of Vocational Expert

George McClellan, a vocational expert ("VE"), also testified at the hearing. He stated Brock's only past relevant work was as a cashier II, and he classified this as light exertional work. The ALJ posed a hypothetical question in which he assumed Brock's age, education, and past work experience, with a capability for the full range of light work with the following exceptions: the job could not require a sense of smell; it had to be near a bathroom facility; it had to be in a clean environment relatively free of dust and smoke and extremes of heat and cold; it could not require fine dexterity with either hand; it could not require peripheral vision to the left; and it could only require occasional climbing of stairs. The VE testified that these restrictions would allow Brock to return to her past cashier work.

The ALJ posed a second hypothetical in which he added the restriction that the individual would miss up to two days of work a month because of headaches resulting from her condition. The VE responded that this would rule out all work.

## D. Summary of Medical Evidence[3]

---

[3]Brock's brief contains a thorough and highly-detailed recitation of the medical records; the Commissioner's brief includes certain supplements to that recitation. The parties do not dispute the facts of those medical records, and do not dispute that Brock was disabled from January 1, 2000 to January 1, 2001. Accordingly, the Court summarily discusses those records in relevant part, with particular abbreviation of the period of agreed disability.

In February 2000, Brock went to the emergency room ("ER") because of losing vision in her left eye. Brock had an MRI of the brain. It revealed a large pituitary tumor.

In February 2000, Phillip Hylton, M.D., a neurosurgeon, evaluated Brock for complaints of double vision and brain tumor. On March 10, 2000, Dr. Hylton performed a craniotomy to remove the tumor. Mitcell Hamburg, M.D., reported that Brock had acromegaly. Brock was discharged on March 15, 2000, with diagnosis of acromegaly with pituitary macroadenoma. Discharge medications included Prednisone, Corgard, and Vicodin.

On April 17, 2000, Brock started radiation treatment for her pituitary tumor. She received radiation five days a week for six weeks.

On April 19, 2000, Brock returned to Dr. Hylton. He noted she still had significant eye problems. In May 2000, Dr. Hylton noted her eye problems had lessened but not completely resolved.

On May 9, 2000, Dr. Mitchell Hamburg, an endocrinologist, examined Brock for follow-up of acromegaly. He planned to start Sandostatin to control acromegalic symptoms while waiting for the effects of radiation treatment.

On June 5, 2000, Dr. Hamburg noted Brock had nausea and diarrhea since starting Sandostatin. Blood work revealed growth hormone and IGF1 levels were elevated.

On July 18, 2000, Dr. Hamburg reported Brock was taking Prednisone, Dostinex, Sandostatin, and Loestrin. Third nerve palsy was nearly gone. IGF1 was elevated and prolactin was below normal.

On October 11, 2000, the nurse practitioner at Brock's treating physician's office noted Brock recently appeared to be experiencing panic attacks. The assessment was panic attack and depression.

On December 27, 2000, Arthur Elman, M.D., reported that MRI done in November showed modest regression of Brock's tumor. Clinically, Brock still had difficulty with superior visual field in her left eye.

On December 28, 2000, Dr. Hamburg reported Brock's acromegalic features had not changed. Blood work revealed Brock's growth hormone and IGF1 levels were elevated, and prolactin level was low.

In December 2000, Brock's medical records show her as "doing well." She reported feeling well and denied problems other than some weight gain.

By letter dated January 2, 2001, John Taylor, M.D., reported he performed a visual exam for Brock on December 29, 2000. Brock continued to have some eye problems, including obvious partial third nerve palsy. Dr. Taylor prescribed spectacle lenses.

From February 2001 through January 2002, William Isley, M.D., gave Brock monthly injections of Sandostatin LAR.

On April 12, 2001, Dr. Hamburg reported that Brock's acromegaly features did not appear changed. Blood work revealed Brock's growth hormone and IGFI levels remained elevated, and prolactin remained low.

On June 12, 2001, Dr. Elman reported that an MRI of Brock's head continued to show regressing disease. He noted she was clinically and radiographically improving.

On August 16, 2001, Dr. Hamburg noted Brock continued to take Sandostatin daily, and Dostinex.  She was off prednisone but continued to take Loestrin and Corgard.  Dr. Hamburg reported Brock's acromegalic features were unchanged.  Blood work revealed Brock's growth hormone and IGF1 levels remained elevated, and prolactin level was low.  Dr. Hamburg increased her dose of Sandostatin.

Later in August 2001, Brock saw a neurosurgeon who noted that she looked well, felt well, and had no new neurological deficits.  He described Brock's vision as "very stable."

Brock reported income of $7,812.77 in 2001.

On January 3, 2002, Brock presented for follow-up treatment and back pain.  She reported that she was working at a gas station, that she did not like her job, and that she was planning to return to college.  Examination showed no cranial nerve palsies and reflexes were good.  The physician opined that Brock was clinically stable.

On January 10, 2002, Brock presented to the ER with feelings of shakiness, dizziness, nausea, and chronic headache.  The ER doctor thought her symptoms could be caused by taking pseudoephedrine and Excedrin with caffeine.

On January 21, 2002, Brock presented for evaluation of back pain.  She was prescribed Vioxx and physical therapy.

On January 30, 2002, Brock presented to the ER after passing out.  The doctor's impression was near syncope and upper respiratory infection.

On February 13, 2002, Brock presented to Dr. Isley.  On physical examination, he

9

noted Brock had large hands, prominent facial features, square jaw and deep voice.  The size of her hands and feet were disproportionate to her body size.  Dr. Isley noted her IGF1 level was still elevated so he increased her dose of Dostinex and scheduled Sandostatin injections.

Brock also saw Dr. Hylton and he noted Brock still had mild acromegalic features, but not as prominent as previously.  She still had "very minimal" partial left third nerve palsy which was barely noticeable.  Her vision was stable.  Brock primarily complained of terrible allergies and stuffy nose, and no sense of smell.  MRI the area in the sella had stabilized and appeared to have shrunk.  There was still enhancement in the area of the cavernous sinuses bilaterally but it appeared static.  Dr. Hylton's impression was stable postsurgical and postradiation changes.

In February and March 2002, Brock had physical therapy for chronic back pain and leg length discrepancy.

On April 22, 2002, Brock told Dr. Elman she had recently noted a subtle drooping of her left eyelid.  She said her Dostinex was recently increased.  IGF1 was elevated, and prolactin was low.

On May 1, 2002, Brock had an MRI of her head.  The radiologist reported unchanged appearance of pituitary macroadenoma – unchanged from the study in June 2001.

On May 22, 2002, Brock presented to Dr. Isley for follow-up of acromegaly.  Dr. Isley noted her acromegaly was stable but still inadequately controlled.  He suspected

Brock could improve with further time from her initial radiotherapy.

In September 2002, Brock returned to Dr. Isley and reported having occasional abdominal pain and lightheadedness and swelling in her hands. Dr. Isley noted Sandostatin could cause gall bladder stones so he wanted this checked.

On September 2, 2002, Brock presented to the ER with reports of abdominal pain. She reported episodes of diarrhea every two to three months with current complaint of two loose stools per day. The doctor thought Brock could have irritable bowel syndrome.

On September 16, 2002, Brock presented to Gary Horner, Ph.D., for a psychological consultation. Dr. Horner estimated her intellectual functioning to be in the broad average range, but her memory for recent events was poor as she was able to recall one of five common objects after five minutes. Brock reported she was applying for disability due to memory problems, pituitary adenoma, nerve palsy, balance problems and ocular problems. She said she had surgery and radiation treatments for a pituitary tumor that left her with double vision, headaches that cause her to have to lie down, and problems with involuntary closure of her eyelids. She also reported increased light sensitivity and endocrine gland changes including deepening of her voice, increased hair growth, and cessation of menses.

Brock mentioned daily life activities to Dr. Horner. She said she drove herself to the appointment. She said she helped with household chores and did her own laundry and grocery shopping. She visited with friends and family.

Dr. Horner found that Brock was able to understand, but would have some

problems remembering even simple instructions.  She would be able to sustain concentration and persistence with simple tasks and was able to adapt to changes in her social environment.  He diagnosed adjustment disorder with mixed emotional features, mild to moderate, untreated; and post surgery for pituitary tumor with multiple residual effects.  He reported that her current Global Assessment of Functioning (GAF) was 55-60, with the highest score in the past year at 60.

On October 3, 2002, Brock presented to evaluate for surgery.  She had been experiencing abdominal pain for three months and she was concerned it was related to her medication.  She also related symptoms of blurry vision, nausea, headache, and shortness of breath due to asthma.  It was determined that she should undergo a cholecystectomy (gall bladder removal).  On November 25, 2002, Brock had a laparoscopic cholecystectomy.

On December 13, 2002, Brock presented to an urgent care clinic with reports of congestion and cough.  Her diagnosis was upper respiratory infection.

On December 18, 2002, Brock presented to Dr. Isley for follow up of acromegaly.  She reported persistent diarrhea occurring five to six times a day.  Dr. Isley noted Brock's IGF1 and prolactin levels.  He continued her monthly injections of Sandostatin for acromegaly and decreased her dose of Synthroid for hypothyroidism.

On December 20, 2002, Brock presented as an outpatient requesting further treatment for asthma.  Brock reported that even going up and down steps she started wheezing and had to use her inhaler.  On exam, the physician noted acromegaly as well as

hirsutism.  She assessed asthma and prescribed Flovent.

Brock reported income of $ 6,487.64 in 2002.

On January 4, 2003, Brock presented to the ER and reported she felt like her heart was racing and fluttering for the past three or four weeks.  The assessment was palpitations and mild hypokalemia.

On January 24, 2003, Dr. Elman reported that Brock's recent MRI showed no evidence of further regression or progression when compared to a study six months earlier.  The MRI was normal with no evidence of microadenoma of macroadenoma.  Brock reported no new medication side-effects and no headaches at that time.

On March 8, 2003, Brock presented to the ER with reports of headache, dizziness, and shakiness.  Physical exam was essentially unremarkable and revealed acromegaly, hypothyroidism and asthma.  There was diplopia with upward gaze.  Head CT revealed frontotemporal craniotomy defects with no intracranial process detected.

On March 25, 2003, Brock presented with reports of a headache for the last three or four weeks.  She said she felt lightheaded.  The assessment was chronic daily headache with photophobia and neck stiffness.  Brock was advised to use Percocet but was warned of the risk of rebound headaches.  The doctor suggested she use massage, relaxation, or anti-anxiety medication.  Elavil was prescribed.

On March 27, 2003, Brock presented to Lamont Weide, M.D., for an endocrine consultation.  Physical exam revealed Brock had a complete inability to raise her left eye above the horizontal, implying a defect in cranial nerve three on the left.  He noted her

most recent MRI in January 2003 was reported as normal with no evidence of microadenoma or macroadenoma.  Dr. Weide assessed acromegaly and planned to decrease her dosage of Dostinex and start her on Sandostatin twice a day.

On March 31, 2003, Brock presented to the ER with reports of chest pain and history of headaches.  She had been slightly lightheaded, but not dizzy.  Medications included Elavil for headaches, Albuterol, Simvastatin and Dostinex.  Chest x-ray was normal.

On April 22, 2003, Brock presented to the ER with symptoms of asthma.  She was given Albuterol.  She returned as an outpatient on April 25, 2003, with reports of a cough and wheezy chest.  The assessment was bronchial asthma exacerbation.  She was given prescriptions for Prednisone, Albuterol Nebulizer, Azithromycin, and Advair.

On May 14, 2003, Brock presented to a clinic with reports of low back pain and cough.  The assessment was low back pain, probably musculoskeletal.  Bextra samples were offered, but Brock was visibly upset that nothing more could be offered to help.

On May 20, 2003, Brock presented to neurology for follow up of headaches.  She said Elavil helped her headaches but made her too sleepy so she stopped taking it.  She said her remaining headaches were tolerable and she would treat with sinus medication.

In May 2003, Brock's asthma was stable.

On June 2, 2003, Brock presented to Dr. Weide at TMC for endocrinology follow up.  Dr. Weide assessed acromegaly and planned to continue Brock's monthly injections of Sandostatin and her other medications.

On June 3, 2003, Brock presented to the clinic with reports of nasal discharge and

headache.  The examining doctor assessed sinusitis, acromegaly, hypothyroid, and bronchial asthma.  He added Zithromax and Flonase to her medications.  Brock returned the next month for follow up of chronic sinusitis and reported nasal drainage and headache.  She received a prescription for Allegra.

On July 8, 2003, Brock presented for MRI of her brain.  The findings were without change from previous exam of January 2003.

On August 5, 2003, Brock presented to Dr. Weide in endocrinology.  She reported symptoms of diarrhea, palpitations and rare chest pain on Synthroid.  Neurological exam revealed decreased cranial nerve three on the left and coarse facial features.  Her IGF1 had increased and prolactin was unmeasurable.  Dr. Weide assessed acromegaly and hypothyroidism and planned to adjust her medication.

On August 18, 2003, Brock presented to the ER with reports of continuing chest pain as well as left shoulder pain.  It had been a problem over the past four to six months and she had made several trips to the ER.  She complained of pain with range of motion to the left shoulder.  The impression was chronic chest pain, most likely musculoskeletal.  Because of her diagnosis of acromegaly, the doctor planned more of a cardiac workup.  She was given Celebrex.

On August 24, 2003, Brock returned to the ER with reports of abdominal burning, especially after eating.  The impression was possible ulcer disease.

On September 13, 2003, Brock presented to the clinic for follow up of symptoms of dizziness.  The doctor found no explainable cause for her dizziness, but prescribed

Meclizine.

On October 13, 2003, Brock presented to the ER with reports of headache, fluttering heart, and high blood sugar. She said she had a history of chest pain, fluttering in her chest, headaches, and dizziness. The assessment was palpitations and headache. She received a prescription for Darvocet for headache.

On November 11, 2003, Brock presented to Dr. Weide for endocrinology follow up. She reported symptoms of constipation, rectal bleeding, diarrhea, palpitations, and hair loss. Dr. Weide believed the constipation and rectal bleeding were indications of hypothyroidism and he increased her dose of Synthroid in hopes of getting her on a dose that worked for her. He continued her medications for acromegaly.

On December 4, 2003, Brock presented to urgent care with reports of sore throat, headache, and cough. The assessment was upper respiratory illness and viral syndrome. Brock was upset that she was not given an antibiotic.

On December 10, 2003, Brock presented for treatment of allergy symptoms and upper respiratory infection.

On December 23, 2003, Brock presented to the outpatient clinic with reports of rash and insomnia. The examining doctor prescribed triamcinolone cream for eczema, and Ambien for sleep issues.

On January 22, 2004, Brock presented for MRI of her brain. The results revealed unchanged appearance of pituitary gland when compared to prior exam. Dr. Elman reported that Brock's MRI study indicated her condition was stable. He indicated that, if

her imaging study was stable at four years, the studies would be stretched out to annual visits.

On February 10, 2004, Brock presented to Dr. Weide for endocrinology follow up. Brock reported symptoms of polyuria, polydipsia, nocturia, and headache which made her lightheaded. He noted a hint of a fine hand tremor and coarse facial features on exam. IGF1 level was elevated, and prolactin was low. Dr. Weide continued her medications for acromegaly and hypothyroidism, and planned to start her on Detrol or Ditropan for hyperactive bladder.

On February 20, 2004, Brock presented with reports of pain and numbness in her left shoulder, hand, and fingers. On March 4, 2004, nerve conduction studies of her left arm were normal, but the possibility of mild radioculopathy could not be excluded.

On March 9, 2004, Brock presented to the clinic with reports of worsening back pain that increased on prolonged sitting or standing. X-ray of her lumbar spine revealed mild degenerative changes involving several lower thoracic vertebral bodies.

On March 17, 2004, Brock presented to the ear, nose, and throat clinic for evaluation of chronic nasal drainage. The doctor was concerned it could be a cerebrospinal fluid leak because of her history of craniotomy. He prescribed Clarinex, Nasonex, and Atrovent to see if it would dry her up. If it did, he felt it would show there was no leak.

On March 23, 2004, Brock presented to a clinic with reports of peptic ulcer disease. Her doctor prescribed Aciphex and recommended EGD if no improvement.

Brock continued to have severe GERD on April 8, 2004, and Aciphex had not helped. Her doctor diagnosed GERD, Hematochezia, and pituitary tumor with hypothyroidism. He recommended an EGD, colonoscopy and blood work.

On April 20, 2004, Brock presented to the ER with reports of vomiting, nausea, and abdominal pain. The impression was gastroenteritis and she received a prescription for Phenergan.

On April 24, 2004, Brock presented to Ram Chandra, D.O., for follow-up. He noted Brock's thyroid was off and he recommended she decrease her thyroid medication. He also prescribed Phenergan for nausea.

On May 4, 2004, Brock presented to Gregory Merritt, M.D., for evaluation of gastrointestinal bleeding. He noted her symptoms of chronic heartburn had been controlled with Omeprazole, but Medicaid was refusing to pay for it. Dr. Merritt's impressions were acromegaly; rectal outlet bleeding, rule out low sigmoid rectal lesion or inflammatory bowel disease; and GERD not controlled. Dr. Merritt performed a partial colonoscopy. Dr. Merritt saw no lesions, but noted internal hemorrhoids. EGD was normal.

On May 6, 2004, Brock presented to a clinic for evaluation of sinus drainage and congestion. The assessment was acute sinusitis and acute bronchitis. She received prescriptions for Omnicef and Panmist LA.

She returned on May 10, 2004, and Dr. Chandra diagnosed urinary tract infection.

On May 11, 2004, Brock presented to Dr. Weide for endocrinology follow up. She

reported experiencing occasional palpitations and said she had gained weight. Her present medications were Synthroid, Sandostatin LAR, Advair, albuterol, Clarinex, Nexium, Nasonex, and ipratropium 22 nasal spray. She was not taking Dostinex and Detrol for the time being. On physical exam, Dr. Weide noted Brock's chronic inability to raise her left eye above horizontal. He noted the hint of a fine hand tremor and she continued to have coarse facial features. In February 2004, her IGF1 was elevated. Prolactin was normal. Dr. Weide assessed acromegaly and reported he was concerned that he could not get her IGF1 level to come down. He was considering additional medications, or possibly additional surgery or radiation. He noted that curing the tumor with surgery in acromegalic patients was notoriously poor. Dr. Weide noted Brock also suffered from central hypothyroidism, hypertension, hyperactive bladder, and abnormal glucose that he planned to continue to monitor.

On June 1, 2004, Brock presented to Dr. Chandra with reports of low back pain. He assessed chronic cervical and lumbar pain. On June 2, 2004, x-rays of her cervical and lumbar spine revealed loss of the normal cervical lordosis and questionable limbus L5 segment.

On June 11, 2004, Brock presented for MRI of the brain. The results could not rule out residual or recurrent tumor.

On June 14, 2004, Brock presented to Dr. Chandra who noted she had a lot of cervical and lumbar myositis. He noted x-rays were negative and recommended heat, rest, and Motrin.

On June 25, 2004, Brock presented to Dr. Weide for endocrinology follow up. Lab results revealed Brock's IGF1 was elevated. Dr. Weide suspected he would have to increase the dose of Sandostatin LAR or add another medication.

On July 6, 2004, Brock presented to the ER with reports of a possible kidney infection. The clinical impression was low back pain and she was given Motrin.

On July 7, 2004, Brock presented to Dr. Elman for follow up. Dr. Elman noted a recent MRI showed no change, but Brock reported her endocrinologist had seen a rise in her growth hormones and was considering altering her Sandostatin treatment. She had no change in her visual acuity and no headaches. Dr. Elman noted that Brock was radiographically stable four years following surgery and radiation for a pituitary adenoma with growth hormone levels. Dr. Elman advised her to follow up with her endocrinologist and explained that reirradiation had attendant risks.

On July 13, 2004, Brock returned to Dr. Hamburg, her endocrinologist. He noted Brock was fatigued and her menstrual periods were irregular. On physical exam, her facial features revealed mild acromegaly. Her IGF1 was elevated, and her thyroid stimulating hormone was low.

On August 12, 2004, Brock presented to the ER with symptoms of nausea and urgency and frequency of urination. She was concerned about high blood sugar levels and had been experiencing dizziness and lightheadedness. The assessment was history of hyperglycemia and Brock was instructed to follow up with her primary care physician.

On August 19, 2004, Brock spoke with Dr. Hamburg's nurse and agreed to start

Somavert to treat her growth hormone level.

On August 25, 2004, Brock presented for follow up of her allergy symptoms. She reported she had not followed up with using Atrovent or Nasonex nasal sprays because they caused headaches. Claritin was helping her symptoms. The assessment was allergic conjunctivitis and rhinitis, in addition to pruritus of the external auditory canals.

On September 28, 2004, Brock presented to Dr. Chandra with reports of frequent urination. Dr. Chandra noted Brock had hyperglycemia associated with her endocrine problem. He assessed probable diabetes and advised her to follow up with her endocrinologist.

## II.    Discussion

In reviewing the Commissioner's denial of benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir.2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### A.    The ALJ's Decision

To establish entitlement to benefits, Brock must have shown that she is unable to

engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d) and 1382c(a)(3)(A). The ALJ found that Brock did not meet this burden.

The ALJ concluded that Brock had severe impairments. She had a history of craniotomy for a pituitary tumor in March 2000 with residuals secondary thereto including headaches and visual problems, bilateral carpal tunnel syndrome with surgery in 1999, a history of asthma, and nonsevere depressive disorder.

However, the ALJ determined that Brock did not have the requisite impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4.[4] The ALJ found that Brock's impairments would not preclude her from performing her former work as a cashier beginning January 1, 2001. Consequently, the ALJ determined Brock was not totally disabled.

Brock raises two main arguments in her brief. She argues that the ALJ's credibility and fact findings are not supported by the substantial weight of the evidence. She also argues that the ALJ erred in finding she could perform her past relevant work.

**B.    Credibility/Factual Findings**

Brock argues that the ALJ's credibility and factual analysis was not supported by

_____

[4]The ALJ commented that Brock's representative did not introduce any evidence or advance any argument supporting a conclusion that her impairments meet or equal a listed impairment in the Listing of Impairments in Appendix 1.

the evidence of the record as a whole. Prior to rejecting a claimant's subjective complaints, an ALJ is required to make an express credibility determination explaining why he does not fully credit the claimant's complaints. *See* 20 C.F.R. §§ 404.1529 and 416.929; *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole. *See Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996); *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996). "If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001) (quoting *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir.1990)). The ALJ in this case considered multiple proper credibility factors in accordance with the Commissioner's regulations and the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

### 1.    Daily Activities

The ALJ considered Brock's own reports of her daily activities. "[A] claimant's ability to perform household chores does not necessarily prove that claimant capable of full-time employment." *Ekeland v. Bowen*, 899 F.2d 719,722 (8th Cir. 1990) (citation omitted). However, activities which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001).

The ALJ found that Brock's own reports of her activities were not consistent with total disability. In January 2002, Brock told her doctor that she was working at a gas

station and planned to return to college. The evidence showed that Brock reported a variety of activities of daily living when she saw Gary C. Horner, Ph.D., in September 2002. Brock told Dr. Horner that she visited with four relatives and three or four friends at least once a week. She had been dating someone for two and one-half months at that time and they played pool together, threw darts, and went out to eat. She said that her hobbies included playing pool and darts, fishing, and playing the drums and flute. Brock reported that she performed twenty percent of the food preparation, twenty-five percent of the clean up after cooking and meals, and thirty-five percent of the household cleaning at her parents' home. She did her own laundry and personal grocery shopping. She did not report that she required additional time to perform these activities. In a questionnaire completed on April 13, 2003, Brock stated that she was able to do her personal shopping and was able to carry her bags herself mostly. She did light cleaning and laundry. In October 2003, Brock reported that she went out with friends on the weekends. In November 2003, Brock reported that she had a boyfriend with whom she was sexually active.

At the administrative hearing, Brock testified that she was able to care for her personal needs. She testified that she was able to perform household chores, but qualified that it was at her own pace. Brock also testified that she had no social life and did not go out dancing or to the movies anymore.

Despite her complaints of double vision, there was evidence that Brock continued to drive an automobile. In September 2002, Brock reported to Dr. Horner that she drove

herself to the appointment. Brock also testified that she continued to drive. Driving in spite of double vision is evidence that Brock did not consider this a disabling symptom.

Brock's ability to engage in many normal daily living activities contradicts her allegations of total disability. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (citations omitted); *see also* 20 C.F.R §§ 404.1529(c)(3)(I) and 416.929(c)(3)(I); *Riggins v. Apfel*, 177 F.3d 689, 692 (8th Cir. 1999) (indicating that activities such as driving children and wife to school, shopping, visiting mother, taking break with wife, watching television, and playing cards were inconsistent with plaintiff's complaints of disabling pain); *Mullin v. Barnhart*, No. C03-1028, 2004 WL 1447967, at *19 (N.D. Iowa June 15, 2004) ("[P]laintiff's daily activities, such as occasional laundry, light cooking, walking his dog, driving to the bank, doctor's appointments, and support group, and playing pool, cards, and darts with friends, do not support the plaintiff's allegations of weakness and fatigue to the point of permanent disability"). Considered in the context of the other evidence, the evidence of Brock's activities supports the ALJ's conclusion that she was not fully credible.

## 2. Brock's Work During Alleged Period of Disability

Moreover, the ALJ considered Brock's own reports that she worked during the period of claimed disability. The ALJ recognized that, though Brock's work activity was "not presumptive of substantial gainful activity," it was still relevant to a determination of her disability. ®. at 24.) Work performed during any period in which Brock alleges that she was under a disability may demonstrate an ability to perform substantial gainful

activity.  *See* 20 C.F.R. §§ 404.1571 and 416.971; *Goff v. Barnhart*, 421 F.3d 785, 792

(8th Cir. 2005) ("Working generally demonstrates an ability to perform a substantial

gainful activity.").  Notably, in 2001, Brock earned wages of $7,812.77, nearly at the

substantial gainful activity level, and earned $6,487.64 in 2002.  The ALJ considered this

evidence of Brock's work to be contrary to her allegations of disabling symptoms during

that time period.

### 3.  Medical Evidence

The ALJ also considered the medical evidence of record and heard testimony from

the ME at the administrative hearing.  After considering this evidence, the ALJ concluded

that Brock was disabled for the closed period ending January 1, 2001, due to her

symptoms arising from a brain tumor, subsequent brain surgery, and radiation therapy.

The ALJ found that, after January 1, 2001, the treatment records did not show significant

findings which would warrant a conclusion that Brock was totally disabled.  Therefore, he

found that after that date, there was medical improvement such that Brock no longer met

the requirements for disability.

Brock argues that the ALJ focused on the medical evidence of her improvement

without considering the medical evidence that she continued to have problems.  Brock

focuses on her hormone levels, her hypothyroidism, her headaches, and the side effects of

her medications.

### a.  Medical Evidence of Improvement

There is substantial medical evidence that, despite some continuing symptoms,

Brock had medically improved after January 1, 2001. She was "doing well" in December 2000: she felt well and denied problems other than weight gain. In January 2001, her eye doctor anticipated she would do well.

In August 2001, Brock reported "intermittent" headaches. A neurosurgeon she saw later that month noted that she: looked well, felt well, had no new neurological deficits, had only minimal nerve palsy which was barely noticeable, and had stable post-surgical and post-radiation changes. Her primary complaint was of allergies.

In January 2002, Brock reported that she was working and planning to return to college; her physician opined she was clinically stable. In January 2003, Brock reported no new medication side effects and no headaches at that time. In May 2003, her asthma was stable.

Brock's MRIs showed no changes. By July 2004, she had no change in visual acuity, headaches, or other findings.

Certainly, Brock had medical problems. She reported to doctors with upper respiratory infections in March 2001, June 2001, January 2002, December 2002, and December 2003; she had occasional sinusitis and bronchitis. She had a fine hand tremor. In May 2004, her physician noted hypertension and hyperactive bladder. She had gastrointestinal issues. She had gallbladder surgery in November 2002. She had some lower back pain. She experienced stable acromegaly, hypothyroidism, headaches, allergies and asthma. However, Brock does not explain how symptoms of these medical necessarily create total disability.

### b.    Acromegaly/Hormone Levels

Brock is concerned that in making the medical improvement determination, the ALJ did not give sufficient consideration to her acromegaly and elevated growth hormone levels.  Evidence showed that Brock continued to have irregular hormone levels after her tumor was partially removed and irradiated.  Dr. Isley stated in May 2002 that Brock's acromegaly was stable, but inadequately controlled.

The evidence indicates that Brock's acromegaly stabilized.  There is evidence that Brock was able to switch to less frequent MRIs because her condition was not changing/worsening.  Although Brock continued to have elevated growth hormone levels, her physicians continued to adjust her medications and described her condition as stable.

Brock's doctors did not indicate what, if any, debilitating symptoms resulted from her hormone levels and/or her acromegaly.  Brock asserts that her fatigue could be attributed to her continuing diagnosis of acromegaly, but there is no medical confirmation of this in her treatment records.  The ALJ recognized Brock's fine hand tremor in his RFC determination.  Brock does not describe any other debilitating symptoms of her acromegaly.

The ALJ's failure to consider the acromegaly/hormone issues as disabling is not contrary to the substantial weight of the evidence.

### c.    Hypothyroidism

Brock asserts that the ALJ did not adequately account for her hypothyroidism. The evidence shows that Brock's hypothyroidism was appropriately monitored and that

her medication was adjusted as needed.

Although she experienced some symptoms that could have been attributed to this condition, there is evidence that they were generally short-term and relieved with medication adjustments. For example, on November 10, 2003, Brock's doctor attributed constipation to Brock's hypothyroidism and adjusted her medication. By her next follow-up appointment on December 23, 2003, this complaint was not even mentioned. Other than her complaint of fatigue – which is not solidly evidenced in the medical records and which the ALJ found inconsistent with Brock's accounts of her activities, Brock does not argue debilitating symptoms of hypothyroidism.

### d.    Headaches

Brock argues that the ALJ did not adequately address her complaint of debilitating headaches. Brock testified to debilitating headaches occurring two to three times per month which required her to lie down and rest for one to two hours at a time. She also stated that some headaches lasted up to a few days.

The medical evidence confirms that Brock complained of headaches. While the ME stated that headaches were a possible symptom of acromegaly, he also opined she was capable of light work. The medical evidence shows that Brock reported "intermittent" headaches, and often indicated that she was not experiencing headaches. Such evidence is inconsistent with Brock's claim that her headaches alone are disabling.

In addition, evidence of Brock's activity level is inconsistent with disabling headaches. The ALJ had the opportunity to hear Brock's testimony concerning the nature

of her headaches, which he discounted based on other evidence of record. The ALJ's finding that the headaches are not disabling is not contrary to the substantial weight of the evidence.

### e.    Side Effects

Brock argues that the ALJ failed to consider the side effects of her various medications. Those side effects, including possible abdominal pain, gallbladder issues, and gastrointestinal issues, are discussed in the medical records. The records do not indicate that those issues are constant, unresolved, or debilitating.

Even considering the evidence specifically argued by Brock, the evidence supports a finding that Brock's symptoms do not amount to total disability. The ALJ's consideration of the subjective aspects of Brock's complaints was consistent with the Commissioner's regulations, and the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

In concluding that Brock's impairments had medically improved, the ALJ appropriately considered Brock's credibility and the medical evidence. Brock's daily activities, work activities, and medical records support the ALJ's conclusion that her subjective complaints were not credible to the extent alleged beginning January 1, 2001. The medical evidence during the relevant time period, when considered with the evidence of record as whole, showed that Brock's impairments had improved such that disabling symptoms were no longer present.

### C.    RFC Findings

Brock contends that the ALJ did not completely consider the evidence in determining her Residual Functioning Capacity ("RFC") for work. "An ALJ bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir.1995)). The relevant evidence to a RFC determination includes the medical records, observations of treating physicians and others, and an individual's own description of her limitations. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citing *Anderson*, 51 F.3d at 779); *see also Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545; SSR 96-8p). RFC findings must be based on all record evidence, and the burden to prove the RFC is on the claimant. *Pearsall v. Massanari*, 274 F.3d 1211, 1217-18 (8th Cir. 2001); SSR 96-8p at 8-9).

## 1. Consulting Psychologist

Brock argues that the ALJ did not properly consider the September 2002 report of Dr. Horner, the consulting psychologist. Brock told Dr. Horner that she had difficulty remembering what to buy at the store, taking the wrong exit off the freeway, and losing her train of thought while talking. Dr. Horner noted that Brock had difficulty with one simple short-term memory test, that her memory for distant events was average, and he stated that further memory testing should be done; he did not note that she lost her train of thought during his examination. Based on the limited information available to him, Dr. Horner opined that Brock would have problems remembering simple instructions.

Dr. Horner's opinion is not dispositive on the issue of Brock's memory problems.

By recommending further testing, Dr. Horner himself indicated that his opinion regarding Brock's memory did not carry significant weight. The ALJ heard Brock's testimony, in which she recalled her symptoms, her medications, and described work she had performed since 2001; she testified specifically concerning her memory problems. The ALJ's conclusion that the memory problems would not prevent work as a cashier is not contrary to the substantial weight of the evidence.

### 2. Medical Issues Interfering with Work

Brock emphasizes her testimony that she had tried to work, but could not because doctors' appointments got in the way. As the ALJ aptly noted, a disability claimant need not be symptom-free in order to be found capable of engaging in substantial gainful activity. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Further, the fact that a claimant must attend regular healthcare appointments does not necessarily indicate that she cannot work; there is nothing in the record to indicate that Brock could not schedule her appointments around her work schedule. *See Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir.2000) (declining to assume that the claimant had to miss an entire day of work for her doctor's appointments).

### 3. Vocational Expert

Brock argues that the ALJ did not properly consider the findings of the VE. The VE's first hypothetical question set forth Brock's limitations in a manner consistent with the ALJ's eventual finding concerning her limitations (which necessarily included his conclusion that her complaints were not entirely credible). *See Starr v. Sullivan*, 981 F.2d

1006, 1008 (8th Cir. 1992) (requiring hypothetical questions to set forth claimants' impairments); *Guilliams v. Barnhart,* 393 F.3d 798, 804 (8th Cir. 2005) (finding discredited subjective complaints properly excluded from hypothetical question).

After the VE answered the first hypothetical question, the ALJ asked whether someone who missed two days of work per month due to headaches could work, considering the limitations set forth in the original hypothetical question; the VE answered that such a person could not. It is clear from the record of the VE's testimony – as well as from the ALJ's decision – that the ALJ was still considering his conclusions when asking the second question of the VE. The ALJ's decision clarifies that he discounted Brock's testimony indicating that she had to miss work due to her limitations. *Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998) (indicating that hypothetical questions need only include limitations found credible by ALJ).[5] As such, the ALJ's consideration of the VE's testimony was appropriate.

## III.    CONCLUSION

Accordingly, it is hereby

ORDERED that Brock's Petition [Docs. ## 1, 8] is DENIED.

---

[5]The ALJ was not required to question the VE or to rely on this testimony as he stopped his analysis at step four of the sequential RFC evaluation process, finding that Brock could perform her prior work. *See Dixon v. Barnhart*, 353 F.3d 602, 648 (8th Cir. 2003) (citations omitted) ("Vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work. Therefore, Lewis's claim that the ALJ posed a defective hypothetical to the vocational expert is moot.").

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: August 28, 2008
Jefferson City, Missouri